Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio



## OPINION

No. 04-07-00382-CV

John H. **VAUGHAN**,
Appellant

v.

David **NIELSON**, M.D. and David Nielson, M.D., P.A.,
Appellees

From the 408th Judicial District Court, Bexar County, Texas
Trial Court No. 2005-CI-16470
Honorable Honorable John D. Gabriel, Jr., Judge Presiding

Opinion by:    Rebecca Simmons, Justice

Sitting:        Catherine Stone, Justice
                Sandee Bryan Marion, Justice
                Rebecca Simmons, Justice

Delivered and Filed:   August 27, 2008

REVERSED AND REMANDED

This is a lack of informed consent and negligence case. The trial court granted summary judgment for Appellees Dr. David Nielson, M.D. and David Nielson, M.D., P.A. (collectively, "Nielson") on claims brought by Appellant John H. Vaughan regarding a surgical procedure by Nielson to treat Vaughan's excessive sweating. We reverse the judgment of the trial court and remand this case for further proceedings.

## BACKGROUND

Vaughan suffered from axillary hyperhidrosis, or profuse sweating in his armpits, due to over-activity of the sympathetic nervous system. After seeing Nielson's website describing endoscopic thoracic sympathecotomy ("ETS") as a treatment option for his condition, Vaughan completed an on-line questionnaire and contacted Nielson's office for a consultation.

A consent form was faxed to Vaughan and a member of Nielson's staff subsequently explained the form via telephone. Vaughan signed and returned the form, and was scheduled for surgery.

On the day of surgery, a nurse employed by Northeast Baptist Hospital (the "hospital") presented Vaughan with a second consent form from Nielson. This second form lists thirteen possible treatments for patients with hyperhydrosis and states that ETS is the "[t]reatment of choice for severe Hyperhydrosis . . . ." The form describes the procedure for ETS and lists the "advantages" of ETS. It describes the probabilities of likely results in percentages for satisfaction, stating "90% for axillary sweating." Additionally, the form lists four possible "side effects" with blanks for the patient to initial, as well as the statement that "I have read and understand all other side effects listed on Dr. Nielson's website and all of my questions have been sufficiently answered."[1] Vaughan initialed all five blanks in the "side effects" section of the form.

---

[1] These side effects were described on the form as follows:

[1] Compensatory sweating on the trunk or thighs may occur in 50% of patients. Sweating in these areas is regarded as a minor inconvenience for most patients. Severe compensatory sweating that can soak through clothing may develop in some patients. The tolerance of compensatory sweating is patient dependent. Some tolerate severe sweating while others do not tolerate even minor compensatory sweating.

[2] Gustatory Sweating (increased sweating while smelling or eating) occurs in some patients.

[3] Impaired sweating of the upper chest/back, hands, face/head.

The form also lists numerous "complications" followed by another blank for the patient's initials indicating that the patient has "read the above complications as listed on Dr. Nielson's website and all of my questions have been answered."[2]  Again, Vaughan initialed this blank. Finally, the form requires the patient to "write the following sentence in your handwriting on the line below[:]  'I have read and understand the above information regarding Micro ETS Surgery.'"  There is no dispute that Vaughan wrote the sentence.  Vaughan then signed the form, as did a witness.

Vaughan also signed a separate consent form provided to him by the hospital.  This form indicated that Vaughan was consenting to a "bilateral endoscopic thoracic sympathectomy."

Vaughan met Nielson shortly before the surgery, and in a brief discussion, Nielson confirmed that Vaughan had read through the side effects.  As a result of this meeting, Nielson also diagnosed Vaughan with Reynaud's Syndrome, basing the diagnosis on holding Vaughan's hand during the meeting.  Nielson then performed surgery on Vaughan.

Since the surgery, Vaughan reports having several serious side effects, including severe "compensatory sweating" (sweating in body parts other than the one for which the patient sought

---

[4]  Heat Intolerance[.]

[2] The complications were listed on the form as follows:

> Serious Complications are unusual
> Possible perforation of breast implants if present
> Sensitive Pleurae (chest lining sensitivity) limiting exercise
> Horners Syndrome occurrence rate 0.3%
> Heat intolerance
> Pneumothorax (collapsed lung)
> Bleeding
> Postop Neuralgia and parasthesias are uncommon
> Possible hair loss
> Bradycardia (slow heart rate) possibly requiring a pacemaker
> Subcutaneous emphysema
> Possible conversion to open thoracotomy
> Possible recurrence of symptoms
> Possible necessity for re-do operations

treatment), heat intolerance manifested by "split body syndrome" (his upper body is frequently cold while his lower body is warm, and vice versa), difficulty with breathing, and lowered maximum heart rate.

Vaughan sued Nielson, alleging lack of informed consent and negligence. Nielson moved for summary judgment on both traditional and no-evidence grounds. The trial court granted summary judgment for Nielson and this appeal followed.

### STANDARD OF REVIEW

In a medical malpractice case, a defendant is entitled to a "traditional" summary judgment when the summary judgment proof establishes, as a matter of law, that there is no genuine issue of material fact as to one or more of the essential elements of plaintiff's causes of action. *Greene v. Thiet*, 846 S.W.2d 26, 29 (Tex. App.—San Antonio 1992, writ denied). In deciding whether there is a disputed material fact issue precluding summary judgment, the reviewing court takes evidence favorable to the nonmovant as true, indulges every reasonable inference in favor of the nonmovant and resolves any doubts in the nonmovant's favor. *Nixon v. Mr. Prop. Mgmt. Co., Inc.,* 690 S.W.2d 546, 548-49 (Tex. 1985). For an informed consent claim, the defendant has the burden to negate one or more of the elements of the plaintiff's claim, which are "(1) a duty of the physician to conform to a certain standard of care; (2) a failure to conform to the required standard; (3) resulting injury; and (4) a causal connection between the [physician's] conduct and the injury." *Greene*, 846 S.W.2d at 29.

In reviewing a "no-evidence" summary judgment, the court examines the record in the light most favorable to the non-movant. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 750 (Tex. 2003). The burden is on the non-movant to present more than a scintilla of probative evidence to raise a genuine issue of material fact on each of the challenged elements. TEX. R.

CIV. P. 166a(i). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch,* 118 S.W.3d at 751 (quoting *Kindred v. Con/Chem., Inc.,* 650 S.W.2d 61, 63 (Tex. 1983)). More than a scintilla of evidence exists if it would allow reasonable and fair-minded people to differ in their conclusions. *King Ranch,* 118 S.W.3d at 751. A no-evidence summary judgment motion should be denied if the non-movant brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. TEX. R. CIV. P. 166a(i).

## INFORMED CONSENT

Vaughan argues that summary judgment was improper on his informed consent claim because Nielson allegedly (1) misrepresented the likelihood of success for ETS for patients with excessive upper body sweating and (2) failed to inform him of the desirability of other treatments for his condition. Vaughan further asserts that had he been provided adequate disclosure of the risks, he would not have had the surgery.

### A.     Chapter 74 of the Civil Practice and Remedies Code

In Texas, informed consent claims are governed by subchapter C of Chapter 74 of the Civil Practice and Remedies Code. Chapter 74 creates the Texas Medical Disclosure Panel (the "Panel") and charges the Panel with responsibility for identifying those medical and surgical procedures that do and do not require disclosure of risks and hazards to the patient or the person authorized to consent for the patient. TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.102-.103 (Vernon Supp. 2008). The Panel creates lists of procedures that require specific disclosures, which are referred to as "List A" procedures, and those that require no disclosure, which are referred to as "List B" procedures. These lists are published first in the Texas Register and then

in the Texas Administrative Code.  *Id.* at § 74.103; 25 TEX. ADMIN. CODE § 6.102 (List A); 25 TEX. ADMIN. CODE § 6.103 (List B).

To satisfy the consent requirement for a List A procedure, the physician must disclose to the patient, or the person authorized to consent for the patient, those risks and hazards identified by the Panel in List A.  TEX. CIV. PRAC. & REM. CODE ANN. § 74.104 (Vernon 2005).  Consent to a List A procedure is effective "if it is given in writing, signed by the patient . . . and by a competent witness, and if the written consent specifically states the risks and hazards that are involved in the medical care or surgical procedure in the form and to the degree required by the [Panel] under Section 74.103."  TEX. CIV. PRAC. & REM. CODE ANN. § 74.105 (Vernon 2005).  If the disclosure complies with these requirements, it creates a rebuttable presumption that the physician complied with Chapter 74's requirements.  TEX. CIV. PRAC. & REM. CODE ANN. §74.106(1) (Vernon 2005).  "[T]he presumption of proper disclosure [can] be rebutted only by showing the invalidity of the consent form, such as by proof that the patient's signature was forged, or that the patient lacked capacity to sign."  *Earle v. Ratliff*, 998 S.W.2d 882, 891-92 (Tex. 1999).  A physician who "ma[kes] disclosures as prescribed by the Panel" cannot be negligent "for not disclosing other risks and hazards associated with the recommended procedure."  *Id.* at 891.

If the procedure is neither on List A nor List B, that is, a procedure about which the Panel has not made a determination as to the scope of the physician's duty to inform, the physician "is under the duty otherwise imposed by law."  TEX. CIV. PRAC. & REM. CODE § 74.106(b).  For such a procedure, the physician's duty is to disclose all risks or hazards that could influence a reasonable person in making a decision to consent to the procedure.  *Peterson v. Shields*, 652 S.W.2d 929, 930-31 (Tex. 1983).

**B.      ETS – List A, List B, or Neither?**

The scope of Nielson's duty to inform is determined by whether ETS is a List A procedure, a List B procedure, or neither.  Vaughan contends that ETS is neither a List A nor a List B procedure and, therefore, Nielson's duty was to disclose all risks that could have influenced his decision.  Nielson argues that, because ETS is a type of endoscopic surgery of the thorax and endoscopic surgery of the thorax is a List A procedure, Nielson was obligated only to disclose those risks required by the Panel to be disclosed for such a procedure.  25 TEX. ADMIN. CODE § 601.2(s)(2).  Vaughan does not dispute that ETS involves an endoscopic surgery of the thorax, but argues that ETS is more properly categorized as a type of sympathectomy, a procedure that the Panel has not designated as List A or List B.

Our research has not revealed any authorities to guide us on how to categorize a procedure when the parties dispute whether it is a List A procedure or not, nor have the parties cited any such authority.  However, we have no trouble concluding on this record that, as a matter of law, ETS is not a List A procedure.

First, Nielson's consent form required Vaughan to consent to "Thoracic Sympathectomy," not endoscopic surgery of the thorax.  "Thoracic Sympathectomy" is described on the form as "[i]nterruption of nerve impulses to sweat glands of the palms, face, and armpits by cutting or electrocautery [of] . . . [t]he ganglia (nerve junctions) which lead to the sweat glands of the palms, underarms, scalp and face."  These nerve junctions "are accessible through the chest (thoracic cavity) because they travel along the side of the spine of the back."  According to the form, "[i]n the past, [to perform a sympathectomy] a rib was removed or a large, painful incision was required."  The form describes Micro ETS as means to gain "easy access" to this part of the spine, "requir[ing] only a single 1/12th inch incision per side."

Endoscopic surgery of the thorax, then, is treated in Nielson's consent form as the procedure by which Nielson would access the nerve junctions along the spine so that he could perform the "Thoracic Symapthectomy."

Also compelling is the consent form provided by the hospital. That form identifies the procedure to which Vaughan consented as "Bilateral Endoscopic Thoracic Symapthectomy." Attached to the form is a comprehensive list of all List A procedures, each with a space for the hospital to check to indicate the procedure being performed, and boxes for the patient and a nurse to initial. The form has a separate section for "List B Procedures" with a space to identify the specific procedure, and another section for "Other Procedure," i.e., neither List A nor List B, also with a space to identify the specific procedure. The hospital form identified two procedures to be performed on Vaughan: (1) in the List A section, the box for "Endoscopic surgery of the thorax" is checked;[3] *and* (2) in the "Other Procedure" section, the box for, "Bilateral Endoscopic Thoracic Sympathectomy (BETS)" is checked and Vaughan's initials are handwritten in the "patient" box. The hospital, then, treated the procedures as distinct, by disclosing risks for *both* endoscopic surgery of the thorax *and* ETS, and by expressly identifying the procedures as List A and "Other" (neither List A nor List B).

We conclude that the hospital form correctly identifies ETS as a non-list procedure. Endoscopic surgery of the thorax was the procedure by which Nielsen accessed Vaughan's thorax so that he could perform the separate procedure of ETS. Nielsen was required to disclose the risks for each of these procedures. Because ETS is a non-list procedure, Nielson's duty was to disclose all risks or hazards which could influence a reasonable person in making a decision

---

[3] The copy of this form in the record is a photocopy that is cut off at the bottom, such that the particular warnings listed for endoscopic surgery of the thorax and the boxes for the patient and nurse to initial are missing. Presumably, like the rest of the form, the warnings for endoscopic surgery of the thorax are those identified by the Panel.

whether to consent to ETS. *Peterson*, 652 S.W.2d at 930; *Ritter v. Delaney*, 790 S.W.2d 29, 30 (Tex. App.—San Antonio 1990, writ denied).

### C.   Adequacy of Disclosure

#### 1.   Failure to advise of other options.

Vaughan claims that Nielsen breached the standard of care by failing to inform him of the risks that ETS was not the proper surgery for him and by failing to encourage Vaughan to attempt other treatments first. The Texas Supreme Court, however, has held that a party alleging that a physician misdiagnosed his condition or failed to advise him of the risk that the procedure might not be necessary does not state an informed consent claim. *Binur v. Jacobo*, 135 S.W.3d 646, 655 (Tex. 2004). "[I]f a physician recommends an unnecessary surgery, there may be liability for negligence in making an erroneous diagnosis or prognosis, but there can be no claim for lack of informed consent." *Id.* Accordingly, evidence that Nielson should have advised Vaughan to try other procedures first, or that Nielson failed to properly diagnose Vaughan's condition, does not support Vaughan's informed consent claim.

#### 2.   Responsibility for disclosure.

Vaughan suggests that there is a fact issue whether Nielson improperly delegated his nondelegable duty to inform Vaughan of the risks. Nielson argues in response that he was not required to personally present the consent form to Vaughan and that he fulfilled his duty to disclose as a matter of law when Vaughan signed the consent form before the surgery.

Texas cases have consistently held that nothing in Chapter 74 requires a physician to personally promulgate the disclosure form. *Jones v. Miller*, 966 S.W.2d 851, 855 (Tex. App.—Houston [1st Dist.] 1998, no pet.); *Eckmann v. Des Rosiers*, 940 S.W.2d 394, 398-99 (Tex. App.—Austin 1997, no writ); *Jones v. Papp*, 782 S.W.2d 236, 240-41 (Tex. App.—Houston

[14th Dist.] 1989, writ denied). To be sure, the physician retains responsibility for the propriety of the disclosure form. *Papp*, 782 S.W.2d at 241. The simple fact, however, that Nielson did not present the form to Vaughan does not raise any fact issue.

### 3. Misrepresenting and understating the risk.

Vaughan also argues that the consent form did not adequately disclose the risks because it misrepresented the success rate of ETS for axillary hyperhidrosis and understated the risk that Vaughan would develop compensatory sweating and other side effects. Citing a Fifth Circuit case, Vaughan asserts that a gross disparity between percentages of success and risk represented in the consent form and actual percentages can render an otherwise proper consent inadequate. *McNeil v. Wyeth*, 462 F.3d 364, 368 and n.4 (5th Cir. 2006) (in product liability involving duty of drug manufacturer to warn, holding that fact issue was raised where manufacturer warn[ed] of a much lower risk than the actual risk, [W]e do not mean to suggest that *de minimis* differences in risk would send the adequacy question to the jury, but when the differences in risk are significant, their potential misleading impact is a question for the jury.").

Nielson asserts that his form disclosed all risks that a reasonable patient would consider in deciding whether to consent to ETS. He further contends that because Vaughan does not allege that he was harmed by the occurrence of an undisclosed risk, Vaughan cannot establish causation. *Greene*, 846 S.W.2d at 31 ("In order to establish that the failure to obtain informed consent was a proximate cause of his injuries, the plaintiff . . . must . . . establish . . . that he developed . . . nondisclosed risks or hazards, or, stated another way, that he was injured by the occurrence of [a] risk of which he was not informed."). Finally, Nielson argues that Texas does not require quantification of the risks and hazards in order for there to be adequate informed consent.

The form that Vaughan signed does disclose all the risks that Vaughan claims occurred as a result of the ETS procedure. Vaughan does not claim, however, that he is suffering from the occurrence of an undisclosed risk. His contention is that by grossly misrepresenting the likelihood of success and the risk of certain side effects, Nielson's disclosure is not adequate. TEX. CIV. PRAC. & REM. CODE ANN. § 74.101 (informed consent claims may be based on failure to disclose "or adequately disclose"). We agree.

As was explained by one court of civil appeals:

When a doctor misrepresents a patient's physical condition, the doctor's diagnosis, or test results, for the purpose of inducing the patient to consent to surgery, the harm caused by the misrepresentation is the formation of a consent decision by the patient based upon inadequate or erroneous facts. In short, the doctor . . . fraudulently obtains a consent to operate. Thus the issue of informed consent encompasses not only the negligent failure to apprise a patient of the risks of an operation but also the fraudulent report to a patient of test results.

*Gaut v. Quast*, 505 S.W.2d 367, 369 (Tex. Civ. App.—Houston [14th Dist.]), *writ denied per curiam on other grounds*, 510 S.W.2d 90 (Tex. 1974). Several other Texas cases treat a claim that a physician secured a patient's consent through misrepresentation as an informed consent claim. *See Theroux v. Vick*, 163 S.W.3d 111, 114 (Tex. App.—San Antonio 2005, pet. denied) (patient's claims that doctor misrepresented his prior experience and training and misrepresented or failed to disclose the risks of need for more invasive surgery are based on "whether [the doctor] adequately disclosed the risks of the surgical procedure to her"); *Baribeau v. Gustafson*, 107 S.W.3d 52, 62 (Tex. App.—San Antonio 2003, pet. denied) ("Baribeau's fraudulent misrepresentation about the extent of the procedure he intended to perform essentially prevented [Gustafson] from making an informed choice about her medical treatment."); *Marks-Brown v. Rogg*, 928 S.W.2d 304, 306 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (allegation that doctor misrepresented nature of patient's cancer and failed to disclose risks of proposed

treatment based upon patient's prior heart condition and medical history is one for lack of informed consent); *Johnson v. Whitehurst*, 652 S.W.2d 441, 446 (Tex. App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.) ("The issue of fraudulent misrepresentation by a doctor is included within the category of informed consent.").[4]

Here, Vaughan presented expert testimony from Dr. Mark Dylewski[5] that the actual chance that ETS would successfully treat axillary hyperhidrosis is 33%, not 90% as represented by Nielson. Dylewski further testified that Nielson downplayed the risk of compensatory sweating, claiming that it "may occur in 50% of patients" and that "it is regarded as a minor inconvenience for most patients," when in fact compensatory sweating occurs in 80-100% of patients, is more pronounced in patients like Vaughan who present with axillary as opposed to palmar hyperhidrosis, and will be "debilitating" in around 25% of patients who have EST to treat excessive armpit sweating.

It is one thing for a reasonable patient to consent to a procedure that he believes has a 90% chance of success; it is another thing altogether to consent to the same procedure knowing it actually has only a 33% chance of success. Similarly, consent to a procedure where the risk of a particular side effect is, in reality, 80-100% and 25% of patients will be "debilitated" by that side effect, is far different than consent after the patient is told that only 50% of patients will

---

[4] Some Texas cases permit plaintiffs to simultaneously state claims for both lack of informed consent and fraud. *See Crundwell v. Becker*, 981 S.W.2d 880, 883 (Tex. App.—Houston [1st Dist.] 1998, pet. denied); *Melissinos v. Phamanivong*, 823 S.W.2d 339, 344 (Tex. App.—Texarkana 1991, writ denied). Here, however, Vaughan disavowed bringing a fraud claim. His summary judgment response stated that he alleged Nielson's misrepresentations about the likelihood of success and side effects as part of his informed consent claim.

[5] Dylewski's qualifications to testify as a medical expert are not at issue in this appeal. Because of the procedural posture of this case, we accept Dylewski's testimony as true. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 750 (Tex. 2003); *Nixon v. Mr. Prop. Mgmt. Co., Inc.,* 690 S.W.2d 546, 548-49 (Tex. 1985).

experience that side effect and "most patients" regard it as "a minor inconvenience."[6] These are not the sort of *de minimis* differences in risk assessments that the Fifth Circuit said in *McNeil* would raise no fact issue. *McNeil*, 462 F.3d at 368 n.4. Rather, the discrepancies in these percentages are sufficient to raise a fact issue as to whether Nielson misinformed Vaughan of the true risks of the procedure. *Id.* at 368 (holding that significant difference between percentages given in warning and actual percentages raises fact issue for jury).[7]

Vaughan also raised a fact issue on causation by testifying that he would not have had the surgery had he known it only had a 33% chance of success and there was a 25% chance that he would experience debilitating compensatory sweating. *McKinley v. Stripling*, 763 S.W.2d 407, 410 (Tex. 1989). This Court held in *Green v. Theriot* that a plaintiff can establish causation in an informed consent case only when his injury is one that he was not informed about. 846 S.W.2d at 141. This holding does not preclude a plaintiff from claiming in an informed consent case that the risk was not adequately disclosed because the physician misrepresented the probability that the risk would occur. There is no meaningful difference between sustaining an injury from a risk

---

[6] The precise issue of whether a gross disparity between the success rates represented by the physician and actual success rates can give rise to an informed consent claim was addressed by the Wisconsin Court of Appeals in *Molitor v. Engeler*, 1990 WL 118263, *3 (Wis. Ct. App. 1990). There, the patient presented testimony that his physicians represented that "there was an 80% chance" that the proposed procedure for treating the patient's cancer would be successful, when in fact the cure rate was "only approximately 15-20%." *Id.* at *3. The court of appeals reasoned:

> A genuine issue of material fact exists regarding [the doctors'] representations to [the patient] on the success rate for the proposed treatment. If the defendants . . . misrepresented to [the patient] their opinions as to the success rate, they breached their duty of disclosure. If that breach occurred, the question will be whether a reasonable person, fully apprised of the success rate, would have consented to the proposed treatment. . . . We cannot say that no reasonable person would have declined such a treatment, knowing that it involved only a fifteen to twenty percent chance of success. The fact-finder must make that determination.

*Id.*

[7] Our opinion should not be construed as requiring a physician to quantify risk levels when informing a patient of a procedure's risks. Here, Nielson made quantification the issue by stating percentages that, according to Vaughan's expert, significantly differ from the actual percentages.

about which the patient was *not informed* and sustaining an injury from a risk about which the patient was *misinformed*. In either case, the patient is entitled to offer proof that the lack of true information caused the patient to consent to a procedure to which he otherwise would not have consented.[8]

Accordingly, because Vaughan raised a fact issue as to the elements of his informed consent claim, we hold that the trial court erred in granting summary judgment dismissing that claim.

## NEGLIGENCE

As noted above, Vaughan alleges that Nielson misdiagnosed his condition, recommended and performed a procedure that was not medically advisable under the circumstances, and failed to recommend safer alternative treatments.[9] These negligence claims are distinct from Vaughan's informed consent claim. Nielson responds that the trial court properly granted a no-evidence summary judgment on Vaughan's negligence claims because there is no evidence that Nielson breached the standard of care in any of these respects.

---

[8] In *Weidner v. Marlin*, No. 04-96-00160-CV, 1997 WL 531129 (Tex. App.—San Antonio Aug. 29, 1997, no pet.), this Court considered a claim similar to Vaughan's. In *Weidner*, the plaintiff brought an informed consent claim (and disavowed claiming fraud) based on the doctor's alleged misrepresentation that there was a 50-80% chance the patient would lose total bladder control or suffer paralysis if he did not have a particular surgery. *Id*. at *8. The plaintiff's expert disagreed with this assessment, testifying that without the surgery, the plaintiff had a 20-25% chance of being as impaired as he was at the time of the testimony. *Id*. at *8 n.10. This Court affirmed a summary judgment for the doctor, however, because the plaintiff's expert also testified that "there was good scientific support for [the doctor's opinon] and . . . that there was a scientifically supportable range of assessing the risk." *Id*. at *8 n.10 and *9. Such "legitimate differences of opinion relating to matters of medical prognosis" and disagreement "among learned experts regarding . . . the risk of not having surgery" meant that, as a matter of law, there was no misrepresentation. *Id*. at *9. Here, on the other hand, Dylewski emphatically testified that the percentages in Nielson's disclosure form were contrary to overwhelming scholarly and scientific research.

[9] Vaughan also claims that Nielson failed to properly train and supervise his staff. This claim, however, is predicated on Vaughan's contention that it was improper for Nielson to secure Vaughan's consent to the surgery through employees or agents, a contention we have already rejected in connection with Vaughan's informed consent claim.

Vaughan presented expert testimony from Dylewski that ETS is seldom, if ever, appropriate for treatment of axillary hyperhidrosis. Dylewski testified that Nielson breached the standard of care by failing to advise Vaughan to attempt alternative treatments and by performing ETS despite a limited chance of success and despite Vaughan's low resting heart rate immediately before the surgery, which was also a contraindication for ETS for Vaughan. Dylewski further testified that Nielson breached the standard of care by diagnosing Vaughan as having Raynaud's disease based solely on holding Vaughan's hand before the surgery.

When the gravamen of a patient's claim is that the physician performed an incorrect or unnecessary surgery, that claim is one for negligence, not informed consent. *Binur*, 135 S.W.3d at 656. Vaughan presented some evidence in support of his claim that Nielson failed to properly diagnose his condition and performed an unnecessary surgery, and the trial court erred in granting summary judgment on that claim. *Id.*

## CONCLUSION

Vaughan presented evidence raising a fact issue as to whether Nielson misrepresented the risks and the likelihood of success for ETS. Vaughan also presented some evidence that Nielson breached the standard of care by misdiagnosing Vaughan's condition, failing to recommend alternative treatments, and performing an unnecessary procedure. The trial court, therefore, erred in granting summary judgment for Nielson.

Accordingly, the judgment of the trial court is reversed and this matter is remanded to the trial court for further proceedings consistent with this opinion.


Rebecca Simmons, Justice